**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CORTEZ LAMON WASHINGTON,<br><br>                                   Petitioner,<br><br>v.<br><br>STUART SHERMAN, Warden,<br><br>                                   Respondent. | Case No.:  15cv2448 MMA (BGS))<br><br>**ORDER:**<br><br>**(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS and**<br><br>**(2) DENYING CERTIFICATE OF APPEALABILITY** |

**I.     INTRODUCTION**

        Petitioner ("Petitioner" or "Washington"), a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego Superior Court conviction in case number SCD227126 for assault and battery. (Pet. at 1-2, ECF No. 1 "Pet.")[1]  The Court has reviewed the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the lodgments, the Traverse, and all the supporting documents submitted by both parties.  For the reasons

---

[1]  Page numbers for the Petition and its attachments cited in this Order refer to those imprinted by the court's electronic case filing system.

discussed below, the Court the Petition is **DENIED**.[2]

## II.    FACTUAL BACKGROUND[3]

### A.    Prosecution Evidence

On the afternoon and evening of March 22, 2010, Washington and Jennifer Gibson attended a barbecue at Nathan White's home. Lodgment No. 1, Rep.'s Tr. vol. 3 at 445, ECF No. 6-3. Washington and Gibson had been in a romantic relationship for about a year, but the relationship was "a little rocky" at that time. *Id.* vol. 1 at 91–92, vol. 2 at 162.

Initially at the party were Washington, Gibson, White and Warner Stoner. (*Id.* vol. 4 at 511.) People were eating, drinking, and smoking marijuana. *Id.* vol. 1 at 96-97, vol. 2 at 157, 200–02, 212, vol. 3 at 450, vol. 4 at 511–12, 535–36, 538. At some point in the late afternoon, Gibson called Tiffany Knight, whom Gibson had met about a week before, and invited her to come to the barbecue. *Id.* vol. 3 at 288, 291, 331–32, 339–40. Gibson and Washington left the party to pick up Knight and bring her back to the house. *Id.* vol. 3 at 291, 341–42. Gibson had been drinking and was too "tipsy" to drive. *Id.* vol. 1 at 146, vol. 2 at 156. Washington had been drinking as well but was not too intoxicated to drive. *Id.* vol. 2 at 161–62. On the drive back to White's house, Knight played with Washington's hair and appeared to be flirting with him. *Id.* vol. 3 at 346-47, 353.

After arriving back at the barbecue, Gibson and Knight sat next to each other on the living room couch and were flirting, touching, and kissing each other. *Id.* vol. 3 at 293, 295, 347–48, vol. 4 at 513, 536–37. Washington wanted to join in. *Id.* vol. 3 at 296–97, 349. Over the next couple of hours, everyone except Knight continued drinking.

---

[2] Although this case was randomly referred to United States Magistrate Judge Bernard G. Skomal pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument are necessary for the disposition of this matter. *See* S.D. Cal. Civ.L.R. 71.1(d).

[3] Because there is there is no state court decision containing a factual summary, the Court takes the facts from the Reporter's and Clerk's Transcripts.

*Id.* vol. 2 at 158–61, 200–02, 212, vol. 3 at 294–95, 345, 350, vol. 4 at 535–36. About an hour and a half after Knight arrived, White left the party and went to his bedroom to go to sleep. *Id.* vol. 3 at 449, 451, 453.

Later in the evening, Washington and Gibson got into an argument and Washington left the party. *Id.* at 296–97. Gibson texted Washington, asking him why he left. *Id.* vol. 4 at 515. Washington responded with several angry text messages to Gibson. The two also spoke on the phone. *Id.* vol. 2 at 223, 225. Gibson was upset that Washington had left the barbecue. She wanted to know why he left because she did not know what she had done wrong. *Id.* vol. 4 at 515, 540. It was not unusual for another woman to be involved in her and Washington's relationship. *Id.* vol. 2 at 172–73.

Washington texted Gibson to meet him at a nearby liquor store, stating "[w]e will finish this." *Id.* vol. 3 at 372, 442. Another text from Petitioner stated, "Fuck that, Be with that ho. We done." *Id.* vol. 3 at 437, 442, vol. 4 at 577–78. In a third text, in response to Gibson's message asking if Washington was going to hurt her, he texted, "No, bitch. We here. Let's get it." *Id.* vol. 3 at 442, vol. 4 at 577–78. Gibson responded, "What?" Washington texted back, "I'm done with you. Go suck pussy." *Id.* vol. 4 at 577–78. Gibson understood that Petitioner was telling her the relationship was over. *Id.* vol. 2 at 226. Knight told Gibson not to respond to the messages. *Id.* vol. 3 at 372. It bothered Knight that Gibson was considering leaving to meet Washington. *Id.* at 372–73.

Washington eventually returned to the party. He seemed upset. *Id.* vol. 1 at 106–07. He and Gibson talked outside the house for a couple minutes. They were arguing and raising their voices. *Id.* vol. 1 at 107, vol. 3 at 299. The two came inside. Gibson entered first then Washington barged in and pushed Gibson against the wall, causing her to fall. *Id.* vol. 1 at 115, vol. 3 at 299, vol. 4 at 516–17. Stoner grabbed Washington and asked him what he was doing and attempted to diffuse the situation. *Id.* vol.4 at 516–17, 543–44. Knight went into the kitchen and got a kitchen knife. She told Washington to leave Gibson alone and leave the party. *Id.* vol. 3 at 300–01, 304, 375–79, 384, 438–384,

vol. 4 at 520. Washington then approached Knight and attacked her, hitting her in the face, choking her and pushing her. *Id.* vol. 3 at 302–03, 305, 388, 401, vol. 4 at 522. Knight dropped the knife and went down to the floor. *Id.* at 302–03, 305, 313, 388, 401. Washington kicked her in the chest and again in the stomach. *Id.* at 307, 315. Petitioner tore off Knight's wig and called her a "bald-headed bitch." *Id.* at 303, 315.

At some point Knight broke free and ran into the living room. Washington followed. *Id.* vol. 1 at 117–18, vol. 2 at 186-87, vol. 3 at 305–06, vol. 4 at 553. He slammed her into a table, pushed her against the wall, and choked her. *Id.* vol. 3 at 305–07, 316–17, 407–09. Washington then pushed Knight up against the wall and slammed her into the television. *Id.* at 306. Gibson and Stoner tried to pull Washington off Knight and restrain him, with little success. *Id.* vol. 1 at 119–20, vol. 4 at 524. Washington then hit Knight in the face. *Id.* vol. 4 at 526. While Washington was shoving Gibson and Stoner, Knight was on the floor, bloody and shaking and holding her arms up to protect her face and head. *Id.* vol. 1 at 119–20, vol. 2 at 186–87, 188–190, vol. 3 at 317, vol. 4 at 524–27, 554.

White, who had previously gone to bed, woke up from the sound of breaking glass and the fight. *Id.* vol. 1 at 121, vol. 3 at 453. White joined Stoner and Gibson in trying to restrain Petitioner. *Id.* vol. 1 at 121, vol. 2 at 183, 192–93, vol. 3 at 453–55, vol. 4 at 484–85, 506, 528. Knight was able to break free. She and Gibson ran into the bedroom and shut the door. *Id.* vol. 3 at 306, 317, 478–79.

White told Washington to leave the house. *Id.* at 319, 453. But Washington wrestled away from Stoner and White, elbowing Stoner in the face and throwing White into a wall. *Id.* at 456, vol. 4 at 495, 497–98, 506–07. Washington yelled, "Fuck that bitch!" *Id.* vol. 4 at 497, 506–07. As Gibson was trying to hold the bedroom door closed, Washington kicked it open. *Id.* vol. 1 at 129–30, vol. 2 at 193–94, vol. 3 at 319, 456–57, vol. 4 at 504, 528–29, 557. Washington entered the bedroom where Gibson and Knight were hiding. *Id.* vol. 3 at 319, 456. He jumped over the bed and started punching Knight, who was in the small space between one side of the bed and the wall. *Id.* vol. 3

at 457–59, vol. 4 at 528–30. He punched Knight hard, with a closed fist, while White and Stoner tried to stop him, and Knight tried to get away. Washington hit Knight in the left eye, causing her to collapse. *Id.* vol. 3 at 320–21, 418-19. Petitioner continued to attack Knight, punching and kicking her as she tried to move away from him by sliding on the floor. *Id.* at 321–22, 398–99, 420–21, 459. Knight lost consciousness. *Id.* at 312, 321, 324, 398, 422.

A friend of Washington's, named Tim, came into the bedroom and pulled Washington away from Knight and out of the house. *Id.* vol. 1 at 133-34, vol. 2 at 197, vol. 4 at 530. Washington fled the scene. *Id.* White called 911.[4] *Id.* vol. 3 at 462. Knight regained consciousness and was transported to the hospital. *Id.* vol. 3 at 321, 462. As a result of Washington's attack, Knight suffered significant swelling to the left side of her face, including a black eye, scratches on her neck and face, and a cut to her upper lip which required five stitches. *Id.* at vol. 3 at 328–29, 465, vol. 3 at 531. When interviewed by law enforcement at the hospital, Knight appeared afraid that Washington would come back and kill her. *Id.* at vol. 3 at 278.

At some point after Washington left the party, Gibson sent him a text message with a photograph of Knight, taken after the incident and stating, "See what you did? We called police." *Id.* vol. 2 at 230, vol. 4 at 578. Petitioner responded via text: "So fuck that. We're not done yet." *Id.* vol. 2 at 230–31, vol. 4 at 578. Following the incident, there was blood in almost every room of the house, on the floors, and on the walls. *Id.* vol. 2 at 247–78, vol. 3 at 270. Most of the blood was in the bedroom, on the wall farthest from the door. *Id.* vol. 3 at 270–71. The police did not collect samples of the blood to determine whose it was. *Id.* vol. 3 at 271–72. A knife in the kitchen was photographed but not collected as evidence. *Id.* vol. 2 at 250, vol. 3 at 272–73.

---

[4] The jury heard the audio recording of the 911 call and reviewed a transcript of the call. (Lodgment No. 1, Rep.'s Tr. vol. 3 at 462, ECF No. 6-3; *see also* Lodgment No. 2, Clerk's Tr. at 17-23, ECF No. 6-6.)

## B.    Defense Evidence

Washington testified in his own defense.  He stated everyone had been drinking that evening.  Gibson and Knight and he began kissing each other, and the women started dancing together.  *Id.* vol. 5 at 612–13.  At some point, Washington realized Gibson had too much to drink and he asked her if she was ready to leave the party.  Gibson refused. *Id.* at 615–16.  Washington left to get cigarettes at a nearby liquor store.  While he was gone, Gibson texted him asking why he left the party.  The two exchanged texts.  It was not an angry conversation.  *Id.* at 617–18.  Washington eventually returned to the party to pick up Gibson.  *Id.* at 620.

Washington and Gibson were about to leave the party when Stoner and Knight asked Gibson to stay.  *Id.* at 624.  Washington denied pushing Gibson.  *Id.* at 626.  He testified that Gibson took a step toward the wall because she could not decide whether to leave the party.  *Id.*  He and Gibson got into a heated discussion about whether to leave. *Id.* at 628.  He heard Knight behind him and when he turned around, he saw Knight coming at him swinging a knife.  *Id.* at 628–30.  Washington put his arm up to protect his face and Knight cut him on his wrist.  *Id.* at 629–30.  He grabbed Knight's wig and pulled it off in an attempt to get her to stop swinging the knife.  *Id.* at 633.  Stoner grabbed Washington, and Knight ran past Stoner into the living room with the knife.  *Id.* at 635, 636, 639.  Washington pushed Stoner.  *Id.* vol. 4 at 535, 537.  While Washington and Stoner were struggling, Washington tried to explain to Stoner that Knight had cut him. *Id.* vol. 5 at 638.  Washington could not see if Knight still had the knife, but he thought she did.  *Id.* at 639.  Gibson ran into the bedroom after Knight to find out what happened. *Id.* at 640–41.

At that point, White woke up and asked what happened.  *Id.* at 641.  Washington told Stoner and White that Knight attacked him.  *Id.* at 642–43.  White told Washington to leave.  *Id.* at 644.  Petitioner testified that he was partially at fault for "the whole thing" because he could have left at that point.  *Id.*  He was so angry he told Gibson, "You can be here, fuck you, fuck these faggots and that bald-headed bitch."  *Id.* at 645.

When Washington said "bald-headed bitch," Knight came out of the bedroom and swung the knife at him. *Id.* at 644–45. Washington rushed toward her and pushed her into the dresser. *Id.* at 646–47. Knight dropped the knife when she fell to the floor. *Id.* at 648. Knight and Washington grabbed for the knife at the same time. 5 RT 649. Knight scratched Washington. He punched Knight in the jaw and she released the knife. *Id.* at 649. Petitioner testified that blood was running continuously from his wrist, and it was dripping everywhere during the struggle. *Id.* at 649. Washington dropped the knife on the floor and kicked it. *Id.* at 650. Washington denied kicking or stomping Knight during the struggle and stated he only punched her once. *Id.* After the struggle, Washington offered to pay for the damage to the house and left afterwards. *Id.* at 650–51. Petitioner testified that he and Gibson continued to stay in touch leading up to the trial. *Id.* at 652.

## III.   PROCEDURAL BACKGROUND

On January 14, 2011, the San Diego District Attorney's Office filed an amended information charging Washington with assault with force likely to produce great bodily injury (Cal. Penal Code § 245(a)(1)) (count one), battery with serious bodily injury (Cal. Penal Code § 243 (d) (count two), unlawful ownership or possession of a firearm and reloaded ammunition (Cal. Penal Code § 1236 (b)(1)) (count three), and driving on a suspended or revoked license (Cal. Veh. Code § 14601.1(a)) (count four). Lodgment No. 2, Clerk's Tr. at 4, ECF No. 6-6. It was further alleged that as to both counts one and two, Washington personally inflicted great bodily injury (Cal. Penal Code §§ 12022.7(e), 1192.7(c)(8)). Lodgment No. 2, Clerk's Tr. at 4-5, ECF No. 6-6.) It was also alleged that Washington had served five prior prison terms (Cal. Penal Code §§ 667.5(b), 668) and had two prior "strike" and "serious felony" convictions (Cal. Penal Code § 67 (a, (b)-(i)), 1170.12). Lodgment No. 2, Clerk's Tr. at 6, ECF No. 6-6.

Jury trial began on April 13, 2011. *Id.* at 211, ECF No. 6-7. On April 21, 2011, the jury returned guilty verdicts on counts one and two. *Id.* at 226-27; *see also* Lodgment No. 1, Rep.'s Tr. vol. 5 at 779–80, ECF No. 6-5. The trial court granted the prosecution's

motion to dismiss counts three and four.[5]  Lodgment No. 2, Clerk's Tr. at 228, ECF No. 6-7; *see also* Lodgment No. 1, Rep.'s Tr. vol. 5 at 788–89, ECF No. 6-5.  Washington admitted his prior convictions and prior prison terms, subject to the trial court's determination whether his prior convictions suffered in Illinois qualified as "strikes" under the Three Strikes Law.  Lodgment No. 2, Clerk's Tr. at 227, ECF No. 6-7; Lodgment No. 1, vol. 5 at 783–88, ECF No. 6-5.

On August 11, 2011, the court found that Washington's Illinois prior convictions qualified as "strikes."  Lodgment No. 1, vol. 5 at 805–07, ECF No. 6-5.  The court sentenced Washington to a total term of 41 years to life.[6]  *Id.* at 810–13; *see also* Lodgment No. 2, Clerk's Tr. at 233–34, ECF No. 6-7.

Washington appealed his conviction in the California Court of Appeal, arguing the trial court erroneously determined that his Illinois prior conviction was a "strike."  *See* Lodgment No. 3 at 20–29, ECF No. 6-8.  On October 31, 2012, the appellate court affirmed Washington's conviction and sentence in a reasoned opinion.  *See* Lodgment No. 6, ECF No. 6-11.

On November 7, 2012, Washington filed a petition for writ of habeas corpus with the California Court of Appeal.  Lodgment No. 7, ECF No. 6-12.  In it, he argued his trial was unfair because his convictions were obtained through false documents and false testimony.  He further argued his trial counsel was ineffective, appellate counsel was

---

[5] Counts three and four had previously been severed from the trial on counts one and two. Lodgment No. 1, Rep.'s Tr. vol. 1 at 62–63, ECF No. 6-1.

[6] The trial court sentenced Washington to an indeterminate sentence of 25 years to life on count one plus 3 years consecutive for personal infliction of great bodily injury.  The sentence on count two, 25 years to life, was stayed pursuant to California Penal Code section 654.  The court sentenced him to an additional 3 years for his prison priors (Cal. Penal Code § 667.5(b)) and 5 years for each of his two strike priors (Cal. Penal Code § 667(a)(1)) for a total sentence of 25 years to life plus 16 years.  *See* Lodgment No. 1, Rep.'s Tr. vol. 5 at 811–12, ECF No. 6-5; *see also* Lodgment No. 1, Clerk's Tr. at 233–34, ECF No. 6-7.

ineffective, the trial court abused its discretion and committed misconduct, the prosecutor committed misconduct, and his sentence was excessive. *See id.* at 15–40. On January 16, 2013, the appellate court denied the petition because Washington failed to first seek habeas review in the superior court. Lodgment No. 9, ECF No. 6-14.

On December 7, 2012, while his habeas petition was still pending before the appellate court, Washington filed a petition for review in the California Supreme Court, raising the same sentencing claims presented to the appellate court on direct review. *See* Lodgment No. 8, ECF No. 6-13. On February 14, 2013, the court denied the petition without comment or citation. Lodgment No. 10, ECF No. 6-15.

Washington then filed a petition for writ of habeas corpus in the superior court on December 26, 2013. *See* Lodgment No. 11, ECF No. 16. In it, he argued his conviction was based on perjured and coerced testimony, in violation of his due process rights, and he also raised several claims of ineffective assistance of counsel, in violation of his Sixth Amendment rights. *See id.* at 21–40. On March 19, 2014, the trial court requested an informal response. Lodgment No. 12, ECF No. 6-17. On June 23, 2014, the District Attorney's Office filed a response. Lodgment No. 13, ECF No. 6-18. On October 24, 2014, the superior court denied the petition as untimely in a reasoned opinion. Lodgment No. 15, ECF No. 6-20.

Washington filed a petition for writ of habeas corpus in the California Court of Appeal on December 31, 2014, raising the same claims as those presented in his petition to the superior court. Lodgment No. 16, ECF No. 6-21. The appellate court denied the petition on the merits on January 29, 2015. Lodgment No. 17, ECF No. 6-22. On April 1, 2015, Washington filed a habeas petition in the California Supreme Court, again raising the same claims of ineffective assistance of counsel and introduction of false or perjured testimony. *See* Lodgment No. 18 at 24–65, ECF No. 6-23. The court denied the petition without comment or citation on June 17, 2015. Lodgment No. 19, ECF No. 6-25.

On October 28, 2015, Washington, proceeding pro se, filed a federal Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court. *See* Pet., ECF No. 1.

On December 18, 2015, Respondent filed a motion to dismiss the petition as untimely. ECF No. 5. The Court granted the motion on September 7, 2016. ECF No. 10. Petitioner appealed, and on May 21, 2019, the Court of Appeals for the Ninth Circuit reversed and remanded the case to this Court. *See* ECF No. 26. On May 22, 2019, this Court ordered briefing on the merits of the claims raised in the Petition. ECF No. 27. Respondent filed an Answer on June 19, 2019. ECF No. 35. Petitioner filed a Traverse on August 7, 2019. ECF No. 39.

## IV.  SCOPE OF REVIEW

Washington's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified

the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

**V.    DISCUSSION**

Washington raises four grounds for relief. In claims one and two, he argues there was insufficient evidence to support the trial court's finding that an out-of-state prior conviction qualified as a "strike" under California's Three Strikes Law. Pet. at 23–34, ECF No. 1. In ground three, Petitioner alleges several instances of ineffective assistance of trial counsel. *Id.* at 36–49. In ground four, Washington contends the prosecution improperly presented false testimony from a witness, Jennifer Gibson. *Id.* at 49–52. Respondent counters that Washington is not entitled to habeas relief because the state courts' denial of the claims was neither contrary to, nor an unreasonable application of, clearly established law. *See* Mem. P. & A. Supp. Answer at 16–47, ECF No. 35-1.

**A.    Illinois Prior Conviction**

In ground one, Washington contends his due process rights were violated because the trial court improperly found that his Illinois prior conviction for aggravated battery qualified as a strike under California's Three Strikes Law. Pet. at 23-31, ECF No. 1; *see also* Traverse at 9–11, ECF No. 39. He further argues in ground one that there was insufficient evidence to show he "personally inflicted" injury in the Illinois case. *See id.* In ground two, Washington alleges there was insufficient evidence to support the finding that his Illinois prior conviction constituted a "strike" because there was no evidence of "personal infliction of great bodily injury." Pet. at 31–34, ECF No. 1; Traverse at 12–13, ECF No. 30. Because claims one and two are related and overlap somewhat, the Court will discuss them together.

*1.    State Court Decision*

Washington raised the claims contained in grounds one and two in his petition for review to the California Supreme Court. *See* Lodgment No. 8 at, ECF No. 6-13. The court denied the petition without comment or citation. Lodgment No. 10, ECF No. 6-15. As such, this Court looks through to the last reasoned state court opinion, that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805-06.

The appellate court denied the claims, stating:

California law defines a serious felony as "any felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice. . . ." (§ 1192.7, subd. (c)(8).)  To "personally inflict" an injury, the defendant must directly cause the injury, and not just proximately cause it.  (*People v. Rodriguez* (1999) 69 Cal.App.4th 341, 347, 81 Cal.Rptr.2d 567.)

Washington argues the record of his prior Illinois conviction does not provide sufficient facts to prove he was the direct cause of the victim's injury.  We disagree.  At the time of Washington's guilty plea, the Illinois court informed him that he was charged with aggravated battery as follows:

" . . . [Washington] knowingly caused great bodily harm to Shara Price, a household member of the defendant, in that [he] struck Shara Price in the face causing her to fall and strike her head.

Washington's counsel then gave the following factual basis for the offense:

"[T]he State would call Shara Price. She would testify that . . . Washington hit her in the head or [face] with his fist causing her to fall.

Washington responded that he understood these allegations, and he pleaded guilty to the aggravated battery charge.

The record of Washington's Illinois guilty plea is factually sufficient to show he directly caused the victim's injury.  Washington admitted he personally caused or inflicted the injury when he struck the victim in the face causing her to fall and sustain injury to her head.  Because the record of Washington's prior Illinois conviction provides a precise factual description of what occurred, the trial court had sufficient evidence to find that Washington "personally inflict[ed]" the injury as required under section 1192.7, subdivision (c)(8).

. . . .

Washington further argues the court erred in finding that his prior Illinois conviction qualified as a strike because "great bodily harm" as required under the Illinois aggravated battery statute (720 Ill. Comp. Stat. 5/12–4(a) (2003)) is not the same as "great bodily injury" under California

law.  We disagree.

In Illinois, "[t]he term 'great bodily [harm]' referred to as an essential element of the offense of aggravated battery is not susceptible of a precise legal definition but is an injury of a graver and more serious character than an ordinary battery." (*People v. Costello* (1981) 95 Ill.App.3d 680, 684, 420 N.E.2d 592, 594 (*Costello*).) [Footnote 3: Illinois uses the phrase "great bodily injury" interchangeably with "great bodily harm" to describe the level of injury required to sustain a finding under the Illinois aggravated battery statute. (*Costello*, *supra*, 51 Ill.Dec. 178, 420 N.E.2d at p. 595.) Ordinary battery requires "physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." (*People v. Mays* (1982) 91 Ill.2d 251, 256, 437 N.E.2d 633, 635–636.) "Because great bodily harm requires an injury of a graver and more serious character than ordinary battery, simple logic dictates that the injury must be more severe than" mere lacerations, bruises or abrasions. (*People v. Figures* (1991) 216 Ill.App.3d 398, 401, 576 N.E.2d 1089, 1092; see *People v. Olmos* (1978) 67 Ill.App.3d 281, 289–290, 384 N.E.2d 853, 860–861 [evidence of three or four welts, 12 to 18 inches in length, left on the back of the victim and bleeding from his left eye was enough to sustain a finding of "great bodily harm"]; see also *Costello*, *supra*, 51 Ill.Dec. 178, 420 N.E.2d at pp. 594-594 [victim suffered great bodily harm from a broken nose and a lost tooth].)

In California, "great bodily injury" is defined as "a significant or substantial physical injury" beyond that which is inherent in the underlying offense. (§§ 12022.7, subd. (f), 667, subd. (a)(1).) An examination of California case law reveals that some physical pain or damage, such as lacerations, bruises, or abrasions is sufficient for a finding of "great bodily injury." (*People v. Jaramillo* (1979) 98 Cal.App.3d 830, 836-837, 159 Cal.Rptr. 771 [multiple contusions, swelling and discoloration of the body, and extensive bruises were sufficient to show "great bodily injury"]; see *People v. Sanchez* (1982) 131 Cal.App.3d 718, 182 Cal.Rptr. 671, disapproved on other grounds in *People v. Escobar* (1992) 3 Cal.4th 740, 755, 12 Cal.Rptr.2d 586, 837 P.2d 1100 [evidence of multiple abrasions and lacerations to the victim's back and bruising of the eye and cheek sustained a finding of "great bodily injury"]; see also *People v. Corona* (1989) 213 Cal.App.3d 589, 261 Cal.Rptr. 765 [a swollen jaw, bruises to head and neck and sore ribs were sufficient to show "great bodily injury"].)

Because Illinois law requires physical injuries more severe than lacerations, bruises, or abrasions to sustain a finding of "great bodily harm,"

it naturally follows that a finding of "great bodily harm" would be sufficient to sustain a finding of "great bodily injury" under California law. Because the elements of "great bodily harm" and "great bodily injury" are the same, Washington's prior conviction of aggravated battery in Illinois is sufficient to show he personally inflicted "great bodily injury" as required under section 1192.7, subdivision (c)(8). Thus, we conclude Washington's prior conviction qualifies as a serious felony and a "strike" under California law. [Footnote 4: In light of our holding, we need not address Washington's argument that his prior record of conviction does not reveal the particular injury the victim sustained and is thus factually insufficient to prove that Washington inflicted "great bodily injury."]

Lodgment No. 6 at 5–7, ECF No. 6-11.

### 2. *Discussion*

First, to the extent Washington argues in ground one that the state court improperly concluded his Illinois prior conviction qualified as a strike under California law, the claim is not cognizable on federal habeas. The Supreme Court has long held that "federal habeas corpus relief does not lie for errors of state law." *Estelle v McGuire*, 502 U.S. 62, 67, (1991); *Swarthout v. Cooke*, 562 U.S. 216, 222 (2011). As such, whether a prior conviction qualifies as a "strike" or other sentence enhancement under California law is a question of state law not cognizable on federal habeas review. *See Miller v. Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir. 1989) ("Whether assault with a deadly weapon qualifies as a 'serious felony' under California's sentence enhancement provisions is a question of state sentencing law."); *see also Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994) ("Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief."); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985). Moreover, federal habeas relief for a state sentencing error "is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process . . . violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (citation omitted).

Under California law, a prior conviction from another jurisdiction may constitute

a "strike" in California if it "includes all of the elements of" a California crime listed as a serious or violent felony "strike" or if it involved conduct that would qualify as a serious or violent felony "strike" under California law. *See* Cal. Penal Code §§ 667(d)(2) and 1170.12(b)(2); *People v. McGee*, 38 Cal. 4th 682, 691 (2006). Here, Washington claims the state court erred in concluding the Illinois aggravated battery statute's "great bodily harm" element is legally comparable to California's "great bodily injury" element, thus making it a strike-eligible offense.[7] Pet. at 23-36, ECF No. 1. Petitioner's claim in ground one that, as a matter of California law, his prior Illinois conviction did not qualify as a "strike" under the Three Strikes Law, does not present a federal question. *See Rhoades v. Henry*, 638 F.3d 1027, 1053 (9th Cir. 2011). Moreover, Petitioner has not shown his sentence was arbitrary and capricious. *See Richmond v. Lewis*, 506 U.S. 40, 50 (1992). Therefore, Washington is not entitled to relief as to this aspect of ground one.

Next, Washington argues, in both ground one and ground two, that there was an insufficient *factual* basis to support a finding that the Illinois prior conviction constituted a strike. Pet. at 30–34, ECF No. 1.) He contends in ground one that that there was insufficient evident to establish "personal infliction" of injury. *Id.* at 30–31. In ground two, he claims there was insufficient evidence to establish "great bodily injury." *Id.* at 31–34. It is clearly established that due process clause is violated "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also*

---

[7] The Illinois aggravated battery statute at the time of Washington's prior conviction provided, in relevant part: "A person who, in committing a battery, intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated battery." 720 Ill. Comp. Stat. 5/12-4(a) (2003). Under California state law, an out-of-state felony prior not specifically listed as a serious felony in California Penal Code section 1192.7(c) can qualify as a serious felony and a strike where the defendant "personally inflicts great bodily injury on any person" within the meaning of California Penal Code section 1192.7(c)(8). *See People v. Rodriguez*, 17 Cal. 4th 253, 261 (1998).

*Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (per curiam ); *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005). Courts must review the state court record and view the evidence in the "light most favorable to the prosecution and all reasonable inferences that may be drawn from this evidence." *Juan H.*, 408 F.3d at 1276 (citing *Jackson*, 443 U.S. at 319). "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). The *Jackson* standard also applies to state sentence enhancements. *Garcia v. Carey*, 395 F.3d 1099, 1102 (9th Cir. 2005).

Washington contends there was insufficient evidence to establish he personally caused the victim's injury. As the California Court of Appeal stated, Washington pleaded guilty to aggravated battery in Illinois in 2003. Lodgment No. 2, Clerk's Tr. at 90–91, ECF No. 6-6. The Information alleged:

> [Washington] knowingly, caused great bodily harm to Shara Price, a household member of the defendant, in that said defendant struck Shara Price in the face causing her to fall and strike her head, in violation of 720 Ill. Comp. St. 5/12–4(a) and against the peace and dignity of the said People of the State of Illinois.

*Id.* at 80. During the change of plea hearing, the trial judge explained the charge to Washington: "[T]he aggravated battery statute you are charged under states that a person who in committing a battery intentionally or knowingly causes great bodily harm or permanent disability or disfigurement commits aggravated battery." Lodgment No. 2, Clerk's Tr. at 90–91, ECF No. 6-6. Washington acknowledged that he understood the charge before entering his guilty plea. *Id.* at 91. The prosecutor then summarized the factual basis for the charge: "[T]he state would call Shara Price. She would testify that on or about the date alleged in the Information that Mr. Washington hit her in the head or with his fist causing her to fall." *Id.* at 96. Washington then affirmed that he was pleading guilty to the charge freely and voluntarily. *Id.* Accordingly, when viewed in the light most favorable to the verdict, there was sufficient to establish Washington

"personally inflicted" the victim's injuries by hitting her in the face and causing her to fall and hit her head.

Further, there was sufficient evidence that those injuries met the requisite standard for "great bodily injury." Washington admitted to causing "great bodily harm" under Illinois law which, as the court of appeal found, necessarily amounts to committing "great bodily injury" under California law. This Court must defer to that court's statutory interpretation. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Hicks v. Feiock*, 485 U.S. 624, 629–30 & n.3 (1988) (Interpretation of state law by state court, including interpretation announced by intermediate appellate court, binds federal court in habeas proceedings.).

Accordingly, given the record before the trial court and viewing it in the light most favorable to the verdict, there was sufficient evidence to reasonably conclude that Petitioner's Illinois conviction qualified as a "strike" conviction under California law. The state court's denial of claims one and two was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407–08. Thus, claims one and two are **DENIED.**

## B. Ineffective Assistance of Counsel

In ground three, Washington claims several instances of ineffective assistance of defense counsel, in violation of his Sixth Amendment rights. Specifically, he argues (1) defense counsel failed to object to photos of the crime scene, (2) counsel failed to move for dismissal based on the government's failure to preserve evidence, (3) counsel failed to request a jury instruction regarding the failure to preserve evidence, (4) defense counsel failed to move to suppress Gibson's testimony, (5) defense counsel failed to investigate and present evidence from an audiotaped jailhouse conversation between Washington and Gibson, (6) defense counsel failed to adequately impeach Gibson on cross-examination (7) counsel failed to investigate and present evidence from Carmen Brooks, and (8) the

cumulative effect of defense counsel's errors amounted to ineffective assistance of counsel.[8] *See* Pet. at 36–49, ECF No. 1; *see also* Traverse at 13–26, ECF No. 39.

### 1. State Court Decision

Washington raised his ineffective assistance of counsel claims in his petition for writ of habeas corpus filed with the California Supreme Court. Lodgment No. 18, at 31–52, ECF No. 6-23. The petition was denied without comment or citation. *See* Lodgment No. 19, ECF No. 6-25. As such, this Court looks through to the last reasoned opinion to address the claims—the California Court of Appeal's January 29, 2015, opinion denying Washington's petition for writ of habeas corpus. *See Ylst*, 501 U.S. at 805–06. In denying the ineffective assistance of counsel claims, the court stated

> Washington also claims his counsel was ineffective at trial. To state a claim for ineffective assistance of counsel here, Washington must show "[c]ounsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors [or] omissions, the trial would have resulted in a more favorable outcome. [Citations.] In demonstrating prejudice, however, the petitioner must establish that as a result of counsel's
>
> failures the trial was unreliable or fundamentally unfair." (*In re Visciotti* (1996) 14 Cal.4th 325, 352.)
>
> Washington claims his counsel was ineffective by (1) not objecting to the admission of bloody crime scene photographs into evidence, (2) not moving for dismissal (or requesting an adverse inference instruction) based on police investigators' failure to collect blood samples and a knife found at the scene of the assault, (3) not moving to suppress Gibson's testimony, (4) not impeaching Gibson with an audiotape containing jailhouse conversations, (5) not investigating the contents of that audiotape, and (6) not investigating a potential exculpatory witness who would support Washington's self defense claim.
>
> As to the first and second grounds, Washington has not shown his counsel's performance fell below an objective standard of reasonableness.

---

[8] For ease of analysis, the Court will address Petitioner's ineffective assistance of counsel sub-claims in a different order than presented in the Petition.

(See *In re Visciotti*, supra, 14 Cal.4th at p. 352.) Washington provides no valid legal basis for excluding photographs of the crime scene, which were plainly relevant. (Evid. Code, § 3 51; see *People v. Weaver* (2001) 26 Cal.4th 876, 931 ["Counsel is not ineffective for failing to make a frivolous motion"].) Washington also provides no valid legal basis for moving to dismiss or requesting an adverse inference instruction based on the police investigation. "[A]s a general matter, due process does not require the police to collect particular items of evidence." (*People v. Frye* (1998) 18 Cal.4th 894, 943.) Even if Washington's claim were characterized as a failure to preserve evidence, he has not shown bad faith on the part of law enforcement, which would be necessary to state a constitutional violation warranting sanctions. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 283.)

As to the third, fourth, and fifth grounds, Washington has shown neither deficient performance nor prejudice. (See *In re Visciotti*, supra, 14 Cal.4th at p. 352.) These grounds stem from Washington's assertion that Washington and Gibson had an audiotaped jailhouse conversation discussing the pressure Gibson felt to testify.

Washington's discussion of the alleged content of the audiotapes is insufficient to show a valid legal basis for any of the avenues he faults his counsel for not pursuing. Moreover, to the extent his discussion rests on Gibson's declaration, it is insufficient for the reasons we have already discussed. His claim of deficient performance is therefore unsupported. (See *People v. Weaver*, supra, 26 Cal.4th at p. 931.) Regarding prejudice, even if Gibson's testimony had been excluded or her credibility impeached through admission of the audiotape, the jury heard testimony from three other individuals who witnessed the assault and provided accounts similar to Gibson's. The evidence against Washington also included angry text messages between him and Gibson regarding the victim, bloody crime scene photographs, and details of the victim's injuries. Given the evidence against him, Washington has not shown that, but for his counsel's ineffectiveness, the trial would have resulted in a more favorable outcome. (See *In re Visciotti*, supra, 14 Cal.4th at pp. 351-352.)

Washington does not appear to have presented his sixth ground to the superior court. We will nonetheless consider its merits. (See *In re Hillery* (1962) 202 Cal.App.2d 293, 294.) Washington contends his counsel failed to investigate and present testimony from a medical technician who treated Washington's wounds after the assault. Washington claims she would corroborate his testimony at trial that the victim cut him

with a knife during the assault and substantiate his claim of self-defense. Where a habeas petition alleges ineffective assistance of counsel based on counsel's failure to investigate, "'[t]he petition must demonstrate that counsel knew or should have known that further investigation was necessary, and must establish the nature and relevance of the evidence that counsel failed to present or discover.' [Citation.] Prejudice is established if there is a reasonable probability that a more favorable outcome would have resulted had the evidence been presented, i.e., a probability sufficient to undermine confidence in the outcome." (*In re Clark* (1993) 5 Cal.4th 750, 766.)

To assess prejudice, we must evaluate three factors: "What evidence was available that counsel failed reasonably to discover? How strong was that evidence? How strong was the evidence of guilt produced [by the prosecution] at trial?" (See *In re Hardy* (2007) 41 Cal.4th 977, 1021-1022.) Washington provides only his own vague and conclusory statement of the testimony he claims the medical technician would have provided. Even assuming the testimony would be as Washington asserts, Washington has not shown he would have obtained a more favorable outcome given the credible and substantial testimony from multiple witnesses at trial that Washington did not act in self-defense. Washington has failed to establish prejudice. (*In re Clark*, supra, 5 Cal.4th at p. 766.)

For the reasons we have stated, we further conclude that Washington has not stated a claim of ineffective assistance of counsel based on the cumulative effect of the grounds discussed above.

Lodgment No. 17 at 2–4, ECF No. 6-22.

### 2. Clearly Established Law

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

Washington must also show he was prejudiced by counsel's errors. *Id.* at 694. Prejudice can be demonstrated by a showing that "there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993). "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id.* at 697.

There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 686-87. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Strickland*, 466 U.S. at 687.

Under the standards of both 28 U.S.C. § 2254(d) and *Strickland*, judicial review is "highly deferential and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted). As a result, "the question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* The *Strickland* prejudice analysis is complete in itself, and there is no need for an additional harmless error review under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *See Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), we apply *Strickland's* prejudice standard and do not engage in a separate analysis applying the *Brecht* standard."); *Avila v. Galaza*, 297 F.3d 911, 918 n.7 (9th Cir. 2002).

### 3. Failure to Object to Photographs of Crime Scene

Washington first argues that defense counsel was ineffective in failing to object to the admission of photographs of the crime scene. Pet. at 36–37, ECF No. 1; *see also*

Traverse at 14–15, ECF No. 39.  Specifically, he contends defense counsel should have objected to photographs showing various areas of White's home, including the living room, kitchen, and bedroom, as they appeared after the altercation.  *See* Pet. at 6.  He argues that because the photographs depicted blood on the walls and floor, they should have been excluded as overly prejudicial.  *See* Pet. at 37, ECF No. 1.  Washington further argues that the photographs gave an improper "impression" that the blood depicted belonged to Knight.  *See id.* at 36.

Counsel's performance is not deficient when failing to make a motion or objection that would have been futile.  *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (concluding that counsel's failure to take a futile action can never constitute ineffective assistance).  Here, the photographs of the crime scene were admissible.  Under California law, the prosecution is permitted to introduce evidence that is relevant and would support its case.  *See People v. Pollock*, 32 Cal. 4th 1153, 1170 (2004) ("The admissibility of victim and crime scene photographs and videotapes is governed by the same rules of evidence used to determine the admissibility of evidence generally:  Only relevant evidence is admissible.") (internal quotations and citation omitted); *People v. Crittenden*, 9 Cal. 4th 83, 133 (1994).

The photographs depicting the state of White's home after the altercation were relevant and admitted to assist the jury in understanding witness testimony and the prosecution's theory.  *See People v. Scheid*, 16 Cal. 4th 1, 18 (1997) (photographs may be admitted to corroborate a witness's testimony).  The photographs were evidence that a crime had occurred and showed where the alleged altercation took place.  The photos were relevant to corroborate and clarify testimony of witnesses who described the scene.[9] They provided a visual image of the physical details of the scene and corroborated the

---

[9] The Court notes that Washington himself specifically requested that several of the photographs be shown during his own testimony to help him describe the incident.  *See* Lodgment No. 1, Rep.'s Tr. vol. 5 at 622, 625, 633–34, 636, 646–48, ECF No. 6-5.

15cv2448 MMA (BGS))

testimony of Gibson, White, Stoner, and Knight. *See Pollock*, 32 Cal. 4th at 1170 ("In a prosecution for murder, photographs of the murder victim and crime scene are always relevant to prove how the charged crime occurred and the prosecution is not obligated to prove these details solely from the testimony of live witnesses.") That the photographs depicted a bloody crime scene did not render them so unduly prejudicial as to make them inadmissible. *See People v. Ramirez*, 39 Cal. 4th 398, 454 (2006) (concluding "gruesome" photographs which "accurately portray[ed] the shocking nature of the crimes" were admissible).

Because the photographs were clearly admissible under California law, Washington has not established that defense counsel's failure to object was unreasonable. *See Rupe*, 93 F.3d at 1445. Likewise, Petitioner has not shown prejudice because any objection to the admission of the photographs would have been overruled. *See Strickland*, 466 U.S. at 697; *United States v. Bosch*, 914 F.2d at 1247 (9th Cir. 1990) (stating that failure to object to admissible evidence does not constitute ineffective assistance of counsel under *Strickland* as it is neither outside the wide range of professionally competent assistance nor prejudicial). As such, the state court's denial of this sub-claim was neither contrary to, nor an unreasonable application of, clearly established law, and Washington is not entitled to relief. *See Williams*, 529 U.S. at 407–08.

> 4. *Failure to Move for Dismissal Based on Failure to Preserve Evidence*

In his second sub-claim Washington argues defense counsel was ineffective in failing to move for dismissal of the case based on law enforcement's purported failure to collect and preserve exculpatory evidence from the crime scene, namely the kitchen knife and blood evidence. Pet. at 37–39, ECF No. 1; *see also* Traverse at 15–17, ECF No. 39.

The Supreme Court has held that law enforcement has a duty to preserve evidence "that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984) (footnote omitted). To meet this standard, the evidence must (1) have "exculpatory value that was apparent before the evidence was

destroyed," and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (internal citation omitted). When evidence is only *potentially* exculpatory, "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," a failure to preserve the evidence only violates due process when a defendant can show officers acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988). "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993) (citing *Youngblood*, 488 U.S. at 56–57). The Ninth Circuit has further held that a "bad faith failure to collect potentially exculpatory evidence would violate the due process clause." *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989); *see also United States v. Martinez-Martinez*, 369 F.3d 1076, 1086 (9th Cir. 2004).

Here, Washington argues that defense counsel should have moved for dismissal of his case based on the failure of law enforcement to collect blood from the scene and the knife purportedly wielded by Knight, as evidence. Pet. at 37-39, ECF No. 1. As the Ninth Circuit has noted, an alleged "failure to collect potentially useful evidence is distinctly different than a destruction of evidence that is already extant." *See Martinez-Martinez*, 369 F.3d at 1087. As such, in order to prevail on such a motion, counsel would have had to establish that law enforcement failed to collect the evidence in bad faith. *See id.*

When officers arrived at White's home in response to the 911 call, Washington had already fled the scene. Lodgment No. 1, Rep's Tr. vol. 4 at 530, ECF No. 6-4. White had told the emergency dispatcher that a man named Cortez Washington had assaulted a woman and that the woman needed an ambulance. *See* Lodgment No. 2, Clerk's Tr. at 19, 21, ECF No. 6-6. He reported to the dispatcher that the victim was bleeding profusely from her face and moving in and out of consciousness. *Id.* at 20. He told the operator that there were no weapons involved, "only fists." *Id.* at 20. When officers

arrived, they took statements from Gibson, White, and Stoner.[10]  (*See id.* vol. 4 at 576-77.)  All three reported that Washington had assaulted Knight, punching her in the face with a closed fist several times, kicking her, shoving her and choking her.  (*See* Pet. Ex. R at 50, Ex. S at 54, Ex. W at 84-85, ECF No. 1-2.)

Knight was bleeding profusely when officers arrived and was transported to the hospital shortly thereafter.  (*See* Lodgment No. 1, Rep.'s Tr. vol. 2 at 216, vol. 3 at 247.)  The emergency room physician testified that Knight had a significant laceration to her lip, which required five stiches.  (*See* Lodgment No. 1, Rep.'s Tr. vol. 3 at 91, ECF No. 6-3.)  The doctor testified that Knight also had substantial swelling and fresh bruising to the left side of her jaw, consistent with being hit in the face.  *Id.* at 234–36.

Officer Garcia testified that he was tasked with taking photographs of the scene.  There was blood on the floor and walls of almost every room in the house.  *Id.* at 268, 270.  Officer Garcia testified that if he saw evidence that needed to be collected, he would have done so.  *Id.* at 268–69.  Officer Garcia had been briefed on what had happened based on statements witnesses had given other officers.  *Id.* at 269.  He testified he had been informed there had been a fight between a man and a woman and the male suspect had choked and battered the woman, causing her to bleed.  *Id.*  Garcia testified that he was told the only person who was bleeding was the victim.  He had "no information that anybody else had been bleeding."  *Id.* at 272.  Likewise, he had no information that any weapon had been used during the altercation.  *Id.*

Given what police knew about the incident at the time they processed the scene, there was no bad faith decision to refrain from collecting blood evidence for later testing because there was nothing to suggest that the blood belonged to anyone other than Knight.  In their statements to law enforcement, Gibson, Stoner and White consistently described Washington as the aggressor.  There was no indication, based on the facts

---

[10] Officer Garcia interviewed Knight at the hospital later that evening.  Lodgment No. 1, Rep.'s Tr. vol. 2 at 249, 255, ECF No. 6-2.

known at the time, that Washington would claim self-defense. And there was no evidence at the time that Washington had been bleeding or was otherwise injured.

Likewise, there is no evidence that officers were aware that Knight had been holding a knife when the altercation began. There is no reference to a knife in police reports from that evening. Officer Garcia testified specifically that he had no information about a knife being involved. *Id.* at 269. He stated that he was looking for bloody items. Although he took a photograph of the knife, Officer Garcia testified it did not catch his eye. *Id.* vol. 2 at 250. He did not see blood on the knife. If he had, he would have collected it. *Id.* at 273. The knife also did not get his attention because it was in the appropriate place, the kitchen, and the entire house was in disarray. The photograph including the knife also depicted spots of blood on the floor, scattered dog food, a knocked over water tank and a metal ring. *Id.* vol. 2 at 250–51.

Based on these facts, defense counsel could have made a reasonable, strategic decision that a *Trombetta/Youngblood* motion would have been unsuccessful because there was insufficient evidence of bad faith. Given the initial statements from witnesses and Knight's injuries, which included profuse bleeding when officers arrived, it was reasonable for officers to conclude the blood on the floor and walls was Knight's. Likewise, at the time Officer Garcia processed the scene, he had no information regarding a knife. He did not notice any blood on the knife and had no reason to believe at the time that it was relevant to the investigation. There is simply nothing in the record to support a finding of bad faith on the part of law enforcement. As such, it was not unreasonable for defense counsel to fail to file a motion to dismiss on *Youngblood/Trombetta* grounds because such a motion would have been denied. *See Rupe*, 93 F.3d at 1445; *see also Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (concluding that an attorney's failure to make a meritless objection or motion does not constitute deficient performance). For the same reason, Washington has not established prejudiced by counsel's failure to file such a motion. *Strickland*, 466 U.S. at 697; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374–75 (1986) (stating that to establish

ineffective assistance of counsel for failure to file a motion, a petitioner must show that the motion was meritorious and a reasonable probability that the result of the proceeding would have been different). The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407–08. Washington is therefore not entitled to relief as to this sub-claim.

> 5. *Failure to Request Jury Instruction Regarding Failure to Preserve Evidence*

Washington contends defense counsel was ineffective when she failed to request a jury instruction about law enforcement's alleged failure to adequately collect and preserve evidence. Pet. at 39–40. ECF No. 1; *see also* Traverse at 17, ECF No. 39. Specifically, he argues that counsel should have requested the jury be given a "suitable cautionary jury instruction that the jury should draw any conflicting inferences regarding the blood and knife in favor of Washington." Pet. at 39, ECF No. 1.

A claim of instructional error does not raise a cognizable federal claim unless the error "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). This can occur if the trial court fails to issue adequate instructions to support the defense theory. *Clark v. Brown*, 450 F.3d 898, 904–05 (9th Cir. 2006); *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002). A defendant is only entitled to jury instructions on a "recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988); *Bradley*, 3154 F.3d at 1098; *see also Clark*, 450 F.3d at 904–05 (stating that a trial court's failure to instruct on a defense theory does not amount to constitutional error unless "the theory is legally sound and evidence in the case makes it applicable") (internal quotation marks and citation omitted). Further, federal habeas relief is not warranted unless the instructional omission was prejudicial. *Clark*, 450 F.3d at 905 ("A habeas petitioner must show that the alleged instructional error 'had substantial and injurious effect or influence in determining the jury's verdict.'") (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637 (1993)).

For the reasons discussed above in section V(B)(4) of this Order, Washington has not established there was any improper destruction of evidence or bad faith failure to collect evidence. Defense counsel's failure to request an instruction that was not supported by the law or the evidence was neither unreasonable or prejudicial. *See Morrison v. Estelle*, 981 F.2d 425, 429 (9th Cir. 1992) (concluding it was not ineffective assistance of counsel when an attorney did not make an argument that "would not have been successful"); *see also James v. Borg*, 24 F.3d at 27 (9th Cir. 1994); *Bauman v. United States*, 692 F.2d 565, 572 (9th Cir. 1982) ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel.") The state court's denial of this sub-claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407–08. As such, Washington is not entitled to habeas relief as to this sub-claim.

### 6. Failure to Suppress Gibson's Testimony

Petitioner claims defense counsel's failure to move to suppress Gibson's testimony amounted to ineffective assistance of counsel. Pet. at 40–41, ECF No. 1; *see also* Traverse at 18–19, EF No. 39. He argues that Gibson's testimony was "materially false" and as such defense counsel should have moved to have it excluded. *See* Pet. at 41, ECF No. 1.

Defense counsel's failure to move to suppress Gibson's testimony was neither unreasonable, nor prejudicial. Gibson was a percipient witness to the events and was also present when law enforcement arrived. She gave a statement to police that evening and law enforcement followed-up with her in the days that followed. *See* Lodgment No. 1, Rep.'s Tr. vol. 2 at 191, ECF No. 6-2. Review of the trial transcripts shows that Gibson's testimony was consistent with those statements and the testimony of other percipient witnesses, Stoner and White. There is simply nothing in the record to suggest Gibson's

testimony was "materially false."[11] In her September 7, 2013, declaration, Gibson states she was "pressured" to testify and had a poor recollection of events. Notably, however, she does not state in her declaration that her testimony was false. *See* Pet., Ex. Q at 41, ECF No. 1-2. In any event, it was for the jury to evaluate Gibson's credibility and the weight to be given to her testimony.[12] *See, e.g.*, *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (noting that it is province of jury to determine credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts). Washington's self-serving, conclusory allegation that Gibson testified falsely is insufficient to establish a reasonable, legal basis for preventing her from testifying. *See James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1994) (stating that conclusory allegations do not warrant habeas relief).

In sum, defense counsel's performance was not unreasonable because there was no legal basis for suppressing Gibson's testimony. *See Rupe*, 93 F.3d at 1445. Furthermore, Petitioner has not shown prejudice because, for the same reason, any such motion would have been denied. *See Morrison*, 981 F.2d at 429; *Bauman*, 692 F.2d at 572. The state

---

[11] Defense counsel did attempt to impeach Gibson's testimony by questioning her about her purported intoxication on the night of the altercation and her failure to remember certain details. *See e.g.*, Lodgment No. 1, Rep.'s Tr. vol. 2 at 151–52, 180–83, 189–90.)

[12] The jury was instructed pursuant to Judicial Council of California Criminal Jury Instruction No. 226, which stated, in part:

> You alone, must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe. In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.

Lodgment No. 6, Clerk's Tr. at 32, ECF No. 6-6.

court's denial of this claim was neither contrary to, nor an unreasonable application of clearly established law. *See Williams*, 529 U.S. at 407–08. Washington is not entitled to relief as to this sub-claim.

### 7. *Failure to Investigate and Present Evidence of Audiotape*

Washington contends counsel was ineffective for failing to investigate and present evidence of audio-recorded conversations between Gibson and Washington, taken while Washington was in jail awaiting trial. Pet. at 43–47, ECFF No. 1; *see also* Traverse at 44, ECF No. 39.

It is clearly established that counsel has a duty to conduct reasonable investigations or to make a reasonable decision that investigation is unnecessary. *Strickland,* 466 U.S. at 691. A decision not to investigate must be assessed for reasonableness under the circumstances at the time, applying a "heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003) (quoting *Strickland*, 466 U.S. at 690–91).

Here, the record indicates that defense counsel subpoenaed the audio recordings from the jail and received them on April 18, 2011, day three of the trial. Lodgment No. 1, Rep.'s Tr. vol. 3 at 262–63, ECF No. 6-3. Defense counsel began presenting her case on April 20, 2011. *See id.* vol. 5 at 600. She did not introduce the recordings or present any evidence related to the audio recordings. There is nothing in the trial record indicating what was on the recordings. Likewise, there is nothing in the record to indicate why defense counsel elected not to use the them at trial.

Washington alleges the audio recordings would have shown that Gibson felt pressured to testify against him. *See* Pet. 43, ECF No. 1. This, he argues, would have undermined her trial testimony. However, there is nothing in the record other than Washington's affidavit that the evidence would have been helpful to his defense. *See* Pet. Ex. G at 114, ECF No. 1-1. Washington's self-serving declaration is insufficient to support his claim. *See Womack v. Del Papa*, 497 F.3d 998, 1004 (9th Cir. 2007) (denying an ineffective assistance of counsel claim where, aside from his self-serving

statement, which was contrary to other evidence in the record, there was no evidence to support his claim); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (noting that there was no evidence in the record to support petitioner's ineffective assistance of counsel claim, "other than from Dows's self-serving affidavit").

Even assuming Petitioner's characterization of the conversations on the recording is accurate, defense counsel may have reasonably declined to introduce them, particularly if doing so would have opened the door to other, potentially damaging information from the recordings to be introduced. In sum, defense counsel did investigate the recordings. She subpoenaed them and received them. The Court presumes that her decision not to introduce them at trial was a strategic one, made after reviewing the content of the recordings. *Strickland*, 466 U.S. at 689 (stating that a defendant must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"). As such, defense counsel's performance was neither unreasonable or prejudicial. The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407–08. Washington is not entitled to habeas relief as to this sub-claim.

### 8. *Failure to Impeach Gibson's Testimony*

Washington further argues that defense counsel was ineffective when he failed to adequately impeach Gibson's testimony with the audio recordings of jailhouse conversations between himself and Gibson. Pet. at 41–43, ECF No. 1; *see also* Traverse at 20, ECF No. 39. Trial counsel's strategy for impeaching a witness involves tactical decisions entitled to deference. *Dows*, 211 F.3d at 487 (9th Cir. 2000). Specifically, "counsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards." *Id.*; *see also Brown v. Uttecht*, 530 F.3d 1031, 1036 (9th Cir. 2008). Furthermore, a petitioner alleging ineffective assistance of counsel due to counsel's failure to impeach a witness must demonstrate that, had the witness been impeached in the manner requested by petitioner, there would be a

reasonable probability that the verdict would have been different. *United States. v. Holmes*, 229 F.3d 782, 789–90 (9th Cir. 2000).

Here, Washington argues defense counsel should have impeached Gibson's testimony with the audio recordings of his jailhouse conversations with Gibson. *See* Pet. at 41–42, ECF No. 1. He alleges those recordings would have shown that Gibson was "coached, coerced and pressured into testifying against Petitioner." *Id.* at 41. As discussed above, it is clear from the record that defense counsel obtained copies of the jailhouse audio recordings and, after review, decided not to attempt to introduce them as evidence or for impeachment purposes. *See id.* vol. 3 at 262–63. There is nothing in the state court record indicating what was contained in the audio recordings other than Petitioner's own declaration.[13] Washington's self-serving allegations regarding what those recordings would have shown is insufficient to overcome the strong presumption afforded tactical decisions made by defense counsel. *See Dows v. Woods*, 211 F.3d at 487. As such, Washington has failed to establish deficient performance or prejudice. The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407–08. Petitioner is not entitled to relief.

### 9. *Failure to Investigate and Present Testimony of Carmen Brooks*

Next, Petitioner claims defense counsel was ineffective when she failed to investigate and call Carmen Brooks as a witness. Pet. at 46–47, ECF No. 1; *see also* Traverse at 45, ECF No. 39. He states Brooks was a friend who worked as a medical technician at Sharp's Memorial Hospital at the time of the incident. He claims that after he left White's home, he went to Brooks's house where she treated him for stab wounds

---

[13] In Gibson's affidavit, dated September 7, 2013, she states that she felt pressured to testify and had little recollection of the events of the evening in question. *See* Pet. Ex. Q at 42–43, ECF No. 1-2. Gibson's affidavit does not, however, contain any reference to conversations she had with Washington while he was in jail or the purported content of the jailhouse audio recordings. *See id.*

he purportedly received from Knight. *See* Pet. at 46, ECF No. 1.

Failure to take steps necessary to produce key witnesses at trial can amount to ineffective assistance of counsel. *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999). However, an attorney is not required to present trial testimony from every witness suggested by defendant. *United States v. Wadsworth*, 830 F.2d 1500, 1509 (9th Cir. 1987) (stating that trial tactics are clearly within the realm of powers committed to the discretion of defense counsel). To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witnesses' testimony created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. *Alcala v. Woodford*, 334 F.3d 862, 872–73 (9th Cir. 2003). A petitioner's mere speculation that a witness might have given helpful information if interviewed is not enough to establish ineffective assistance. *See Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), amended by 253 F.3d 1150 (2001).

Here, Washington alleges Brooks's testimony could have supported his contention that Knight had stabbed him and he had acted only in self-defense. *See* Pet. Ex. HH at 140–41, ECF No. 1-2. In her January 2015 declaration, Brooks states "One day [Washington] came to her with cuts on his hands. He knew I was in the medical field and asked me for help. There were cuts on the insides of both hands. . . He may have told me what happened but now I can't recall. I didn't really want to know." *Id.* Brooks further states that she was never contacted by defense counsel or investigators. *Id.*

It was not unreasonable for defense counsel to make the tactical decision to decline to call Brooks as a witness. At trial, before the defense counsel called her first witness, there was discussion about Brooks's potential testimony. The prosecutor noted that three months after the incident with Knight, Washington had gotten into a "scuffle" with Brooks. The prosecutor stated:

> Carmen Brooks. And basically the what the [sic] report says is, you know, I asked Washington how Brooks got the swollen lip. Washington

avoided answering the question and said, what would you do. I asked
Washington if he hit Brooks in self-defense. And he said I put hands up to
keep her from scratching me.

Lodgment No. 1, Rep.'s Tr. vol. 5 at 593. The prosecutor indicated that if Washington
testified and claimed self-defense, he would seek to impeach Washington with evidence
that he used the same self-defense claim with Brooks as he did with Knight. *Id.* at 593.
Defense counsel objected, noting that doing so would require Brooks's testimony.
Defense counsel stated that despite her efforts, she had been unable to contact Brooks.
The following exchange then took place:

> The Court: Is she the one that allegedly saw the cut hands?
>
> [Defense Counsel]: Yes, your honor.
>
> The Court: Where is she?
>
> [Defense Counsel]: I had a phone number. I've left many messages for her.
> I believe that Mr. Kiminski had gone out to either attempt to talk to her or
> had the investigator. And she was not cooperative back then so she's not a
> witness for us.
>
> The Court: How did she fit into this? Was she at the hospital?
>
> [Defense Counsel]: She's just, like he said, a former girlfriend, and it just
> happens that after the events occurred, he went over to her place, and she
> happened to be a nurse and happened to bandage up the injuries.

*Id.* at 594.

After a little more discussion, the trial court ruled that because Brooks was not
testifying for the defense, any impeachment with evidence of the altercation between
Washington and Brooks and Washington's history of claiming self-defense would be
excluded. The trial judge stated:

> Okay. Well, that I think this: That if Ms. Brooks were available, then
> she could potentially talk about the cut hands. And she could also talk about
> getting hit. But she's not here. So I'm going to keep out the evidence.

*Id.* at 596.

Based on the trial record, it is clear defense counsel attempted to locate and interview Brooks but was unsuccessful. Moreover, even assuming defense counsel had located Brooks, declining to call her as a witness would not have amounted to deficient performance. Brooks's testimony could have opened the door to introduction of damaging evidence against Washington, namely, that he had gotten into a physical altercation with Brooks, given her a swollen lip and later made a claim of self-defense strikingly similar to his self-defense claim in Knight's case. Such a strategic decision by defense counsel is afforded great deference. *Strickland*, 466 U.S. at 689–90. Brooks's testimony could have been damaging to the defense and therefore, even assuming Brooks had been available to testify, the failure to call her as defense witness was neither deficient performance, nor prejudicial. *See id.* at 690. Accordingly, the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407–08. Washington is not entitled to relief as to this sub-claim.

### 10. Cumulative Error

Finally, Washington argues that the cumulative effect of defense counsel's errors amounted to ineffective assistance of counsel. Pet. at 47–49, ECF No. 1; *see also* Traverse at 45–46, ECF No. 39. Under the cumulative error doctrine, the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even if each error considered individually would not warrant relief. *See Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (characterizing this principle as clearly established by the Supreme Court). The Ninth Circuit has applied this principle in the context of *Strickland* and has held that prejudice may result from the cumulative effect of multiple deficiencies by counsel. *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995).

Ninth Circuit has observed that "[w]e must analyze each of [petitioner's] claims separately to determine whether his counsel was deficient, but 'prejudice may result from

the cumulative impact of multiple deficiencies.'" *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)). The cumulative impact of counsel's errors can give rise to prejudice, particularly where a series of errors prevent the proper presentation of a defense. *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998); *see also Harris*, 64 F.3d at 1438–39 (finding that eleven errors by counsel amounted to cumulative prejudice because they raised a reasonable probability the outcome of trial might have been different).

For the reasons discussed above, Petitioner has identified no deficiencies of counsel which could accumulate. Even if he had, he has not shown that he was prejudiced, individually or cumulatively, by any of the alleged errors. *See Strickland*, 466 U.S. at 694; *Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and section 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so."); *see also Pinholster*, 563 U.S. at 181 (holding that those standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt"). As such, the state court's denial of Petitioner's cumulative error sub-claim not unreasonable and therefore Washington is not entitled to relief. *See Williams*, 529 U.S. at 407–08.

### 11.    Conclusion

For the reasons discussed above, the state court's denial of Washington's claims of ineffective assistance of counsel was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407–08. Therefore, claim three is **DENIED**.

### C.    **False Testimony**

In ground four, Washington contends Gibson gave false testimony at trial, in violation of his due process rights. Pet. at 49–52, ECF No. 1; *see also* Traverse at 23, ECF No. 39. He argues that Gibson was "coerced and threatened by authorities into testifying against Petitioner" and has since recanted her trial testimony. *See* Pet. at 51, ECF No. 1. He contends that Gibson's purportedly false testimony rendered his trial

fundamentally unfair. *See id.* at 51–52.

### 1. State Court Decision

Washington raised this claim in his petition for writ of habeas corpus to the California Supreme Court. Lodgment No. 18, ECF No. 6-24. The petition was denied without comment or citation. Lodgment No. 19, ECF No. 6-25. This Court therefore looks through to the opinion of the California Court of Appeal, Lodgment No. 17, ECF No. 6-22, the last reasoned opinion to address the claim. *See Ylst*, 501 U.S. at 805–06. The appellate court denied the claim:

> In his petition, Washington contends his due process sights were violated because a witness, Washington's then-girlfriend Jennifer Gibson, gave false testimony at trial. Washington submits a sworn declaration from Gibson that he claims establishes Gibson testified falsely. Such post-trial declarations are "to be viewed with suspicion." (*In re Weber* (1974) 11 Cal.3d 703, 722.) Gibson's declaration states (1) she was heavily intoxicated on the night of the assault and cannot remember the events clearly, (2) she was reluctant to testify at trial because she could not give "a precise account," (3) she felt pressured by the prosecution to testify at trial, (4) other witnesses were pressured as well, and (5) she reviewed typed statements of "accounts that were told to me" before taking the stand to testify. Gibson also states, "I could not, in good conscience, allow for that previous misinformation to stand in good faith; and I am now here to help right a wrong that I partook in . . . I was scared, confused, and mislead [sic] into doing something that was not right." (Ellipsis in original.)

> To obtain habeas relief based on false testimony, Washington must show that Gibson provided false testimony at trial that was material or probative on the issue of his guilt. (*In re Roberts* (2003) 29 Cal.4th 726, 741-742.) Here, Gibson's declaration does not specify what portions of her testimony, if any, were untrue. The fact that she was intoxicated and could not give a "precise account" was no bar to her testifying truthfully about what she remembered. Those circumstances may be, and in fact were, the subject of cross-examination at trial. Gibson was subpoenaed to testify at trial, so she undoubtedly felt pressure to testify. Gibson does not say that any pressure, or her review of typed statements, led to any untrue testimony by her or anyone else. Gibson's reference to unspecified "misinformation" in her concluding statement is too vague and conclusory to show that any portion of her testimony was in fact false. (See *People v. Duvall* (1995) 9

Cal.4th 464, 474.) Because Washington has not shown Gibson gave any materially false testimony, or any false testimony at all, Washington has not established grounds for habeas relief. (See *In re Roberts*, supra, at pp. 741-742.)

Lodgment No. 17 at 1–2, ECF No. 6-22.

### 2. Discussion

The government's knowing use of false or perjured testimony against a defendant to obtain a conviction violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)). The result is the same when a prosecutor, "although not soliciting false evidence, allows it to go uncorrected when it appears." *See Napue*, 360 U.S. at 269. But the presentation of conflicting versions of events, without more, does not constitute knowing presentation of false evidence. *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002). To prevail on a *Napue* claim, (1) the testimony or evidence must be false, (2) the prosecution must have known or should have known it was false, and (3) the false testimony must be material. *See Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (citing *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)).

Falsity is not established merely by showing that the witness made an earlier inconsistent statement or that the witness's testimony differs from that of another witness. *See Zuno-Arce*, 44 F.3d at 1423; *see also Geston*, 299 F.3d at 1135; *Tayborn v. Scott*, 251 F.3d 1125, 1131 (7th Cir. 2001) (stating mere inconsistencies in the testimony of a government witness fall short of establishing that the government knowingly used false testimony). "Discrepancies in testimony . . . could as easily flow from errors in recollection as from lies." *Zuno-Arce*, 44 F.3d at 1423.

Washington's allegations do not demonstrate a *Napue* violation for two reasons: He has not shown (1) that the evidence in question was false or (2) that the prosecutor knew or reasonably should have known it was false. *See Mancuso*, 292 F.3d at 957 (rejecting *Napue* claim where there was no evidence prosecutor presented false

testimony); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001) (rejecting claim that prosecution suppressed evidence that witness's testimony was false because petitioner presented no evidence that prosecution knew it was false).

First, Washington has not established Gibson's testimony was false. The Ninth Circuit has found a witness's later recantation alone is not a sufficient basis upon which to find her previous testimony false. *See Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004) ("That a witness says some years later that she lied at trial does not furnish a basis for granting the writ on account of the state's knowing use of perjury."); *see also Hysler v. Florida*, 315 U.S. 411, 413 (1942) (noting that a defendant "cannot, of course, contend that mere recantation of testimony is in itself ground for invoking the Due Process Clause against a conviction").

Gibson testified at trial in August 2010 that Washington seemed upset with her for flirting with Knight at the party. Lodgment No. 1 vol. 1 at 102, ECF No. 6-1. She stated that he left the party at one point. While Washington was gone, he sent angry texts to Gibson. *Id.* at 105–07. When he returned, he argued with Gibson. She testified that she asked him what was wrong but could not remember his response. Washington then shoved her against the living room wall. *Id.* at 107, 115. Knight, who was in the kitchen, grabbed a kitchen knife in an attempt to protect Gibson. *Id.* at 107–08, 115–16. Knight yelled for Washington to leave Gibson alone. *Id.* at 107. Washington then attacked Knight, who dropped the knife. *Id.* at 115, 118. Washington began hitting Knight in the face repeatedly with a closed fist. *Id.* at 115–16, 118–19, 121. Gibson and Knight attempted to escape to a bedroom, but Washington kicked the bedroom door open and attacked Knight again, hitting her "hard" several more times with a closed fist, as Knight cowered on the floor. *Id.* at 122, 127, 130–33. Gibson testified that she, Stoner, and White (who was awakened by the commotion) attempted to stop Washington several times. *Id.* at 119–120, 132. A friend of Washington's ultimately subdued Washington and pulled him out of the house. *Id.* at 133–34. In sum, Gibson's trial testimony was consistent with the statement she gave law enforcement shortly after the incident. *See*

Pet., Ex. S at 54–57, ECF No. 1-2.  It was also consistent with testimony of other eye witnesses, including Warner, White, and Knight.  *See generally*, *id.* vol. 3 at 315–27, 453–63, vol. 4 at 517–29.

In her 2013 declaration, Gibson states that on the night of the incident she was "heavily under the influence of alcohol so I can't quite remember the actual accounts clearly."  Pet., Ex. Q at 42, ECF No. 1-2.  She claims that prior to her trial testimony, she was given a "typed version of some of the accounts" and familiarized herself with them before taking the stand.  She states she was "pressured by the authorities who insinuated through their actions that I would be in some type of trouble for not testifying."  *Id.*  She asserts that authorities also "harassed" Stoner and White to testify as well.  *Id.* at 42–43.  Finally, she states that she "could not, in good conscience, allow for that previous misinformation to stand in good faith."  *Id.* at 43.

Gibson's vague, after-the-fact declaration in which she attempts to recant her testimony is insufficient to establish falsity.  *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005) (stating that a witness's "later recantation of his trial testimony does not render his earlier testimony false").  In general, recantations are properly viewed with great suspicion.  *Id.*  While Gibson refers to "misinformation" in her 2013 declaration, she fails to point to anything specific in her trial testimony that was untrue.  She states merely that she could not remember the events clearly, she felt pressure to testify, and she reviewed summaries of her previous accounts prior to testifying.  Pet. Ex. Q at 42–43.  This is not inconsistent with her trial testimony.  Gibson admitted at trial that she had been drinking on the day of the incident and her memory was fuzzy on some of the details.  Lodgment No. 1, vol. 1 at 98, 104–05, 132 ECF No. 6-1.  She responded to several of the prosecutor's questions by stating that she did not remember.  *See e.g.*, *id.* at 100, 104, 114, 117.  At several points in her testimony, the prosecutor asked Gipson to refresh her recollection by reviewing police reports containing her initial statements.  *Id.* at 105–06.  When doing so, the prosecutor specifically asked her to only testify as to what she remembered and directed her to refer to her prior statements only to the extent doing

so refreshed her recollection. *See id.* at 105. Beyond Gibson's vague statement that her testimony was "misinformation," there is nothing in the 2013 declaration that specifically suggests any portion of Gibson's trial testimony that was untrue. *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) (stating that conclusory allegations not supported by a specific facts do not warrant habeas relief). Thus, Washington has failed to establish that Gibson gave false testimony. *See Allen*, 395 F.3d at 994.

Second, even assuming Gibson's testimony was false, there is nothing in the record to suggest that the prosecutor knew it to be false. As noted above, to establish a due process violation, a petitioner must show that the prosecution knowingly used perjured testimony. *Napue*, 360 U.S. at 270–71. Here, the prosecutor could reasonably have believed that Gibson's statements implicating Washington were truthful because, as discussed above, those statements were consistent with her prior statements to police and with the statements and testimony of other eyewitnesses. Based on Gibson's prior statements and corroborating testimony of other witnesses, Washington has failed to establish that that prosecution knew, or reasonably should have known, that Gibson's testimony was false. *Murtishaw*, 255 F.3d at 959; *see also Allen*, 395 F.3d at 994 (finding recantation testimony was unreliable "because his trial testimony implicating [the petitioner] is consistent with the other evidence, while his recantation is not"). It was for the jury to determine whether Gibson was a credible witnesses and how much of her testimony to believe. *See, e.g.*, *Walters*, 45 F.3d at 1358 (noting that it is province of jury to determine credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts). Finally, as discussed above, Gibson was a percipient witness and her testimony was relevant and admissible. There was nothing improper about the prosecutor subpoenaing a purportedly reluctant eyewitness to testify.

In sum, Washington has failed to show Gibson's trial testimony was false and even assuming falsity he has failed to show the prosecutor knew or reasonably should have known, her testimony was false. The state court's denial of Petitioner's due process claim was therefore neither contrary to, nor an unreasonable application of, clearly

established law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 407–08. Claim four is therefore **DENIED**.

## VI.   CERTIFICATE OF APPEALABILITY

Under AEDPA, a state prisoner seeking to appeal a district court's denial of a habeas petition must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). The district court may issue a certificate of appealability if the petitioner has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy this standard, a petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a). The Ninth Circuit has noted that the standard for granting a certificate of appealability is "relatively low." *Jennings v. Woodford*, 290 F.3d 1006, 1010 (9th Cir. 2002). A petitioner "need not show that he should prevail on the merits," *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000), but may be entitled to a certificate when the "questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (citation omitted), *superseded on other grounds* by 28 U.S.C. § 2253(c)(2). Here, Petitioner has failed to make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and reasonable jurists would not find debatable this Court's assessment of Petitioner's claims. *See Slack*, 529 U.S. at 484. Accordingly, a certificate of appealability **DENIED**.

/ / /

/ / /

/ / /

/ / /

/ / /

## VII. CONCLUSION

Based on the foregoing, the Court **DENIES** the petition for writ of habeas corpus and **DENIES** a certificate of appealability.

**IT IS SO ORDERED.**

Dated: September 30, 2019

Hon. Michael M. Anello
United States District Judge

15cv2448 MMA (BGS))